## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**MARTHA M. KELLEY,**

   **Plaintiff,**

**v.**              **CIVIL ACTION NO.**  3:23CV740

**DOVENMUEHLE MORTGAGE, INC.,**

 **SERVE:**  **C T Corporation System, Registered Agent**
       **4701 Cox Rd., Ste. 285**
       **Glen Allen, VA  23060**

**EXPERIAN INFORMATION SOLUTIONS, INC.,**

 **SERVE:**  **David N. Anthony, Registered Agent**
       **TROUTMAN SANDERS, LLP**
       **1001 Haxall Point**
       **Richmond, VA 23219**

**TRANS UNION, LLC,**

 **SERVE:**  **Corporation Service Company, Registered Agent**
       **100 Shockoe Slip, 2nd floor**
       **Richmond, VA  23219**

**and**

**EQUIFAX INFORMATION SERVICES, LLC,**

 **SERVE:**  **Corporation Service Company, Registered Agent**
       **100 Shockoe Slip, 2nd floor**
       **Richmond, VA  23219**

       **Defendants.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **MARTHA M. KELLEY**, by and through Plaintiff's undersigned counsel, and alleges the following against Defendants DOVENMUEHLE MORTGAGE, INC., EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION LLC, and EQUIFAX INFORMATION SERVICES, LLC.

### PRELIMINARY STATEMENT

1.      This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to enforce and protect the civil rights of the Plaintiff afforded and enacted by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA") and the Real Estate and Settlement Procedures Act, 12 U.S.C. §§ 2601–2617 ("RESPA").

2.      Today in America there are three major consumer reporting agencies, Experian Information Solutions, Inc., Trans Union, LLC, and Equifax Information Services, LLC. These agencies are also referred to collectively as the "CRAs."

3.      The FCRA demands the CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report pursuant to 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it pursuant to 15 U.S.C. § 1681i.

4.      The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Dovenmuehle Mortgage, Inc., particularly where a consumer makes a dispute about information reported.

5.      Also, when a consumer like Plaintiff disputes the accuracy of information through the agencies, those disputes are transmitted to the party furnishing the information, here

Dovenmuehle Mortgage, Inc. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannototherwise verify.

6.     Plaintiff brings claims under Section 1681e(b) against all three CRAs because each CRA reported inaccurate information about the Plaintiff regarding her Dovenmuehle mortgage account. When Plaintiff disputed these inaccuracies, the CRAs did not reasonably investigate, also violating Section 1681i.

7.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy." Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).  This is particularly true as to how the CRA Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. The CRA Defendants have been repeatedly sued by consumers, sanctioned by regulators and reprimanded by both district and appellate courts to do more than an automated parroting of what their creditor-customers instruct. Had they followed that advice and heeded those warnings, Plaintiff would not have been harmed.

8.     Likewise, Dovenmuehle Mortgage, Inc. violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and thereafter failed to reasonably investigate those disputes. Instead, discovery will show all that Dovenmuehle did was consult its own records about the account and confirm to the CRAs the inaccurate information it was already reporting.

9.     Plaintiff further alleges claims against Dovenmuehle Mortgage, Inc. for its violations of RESPA, 12 U.S.C. §§ 2605(e) and (k). On two occasions Plaintiff send Qualified Written Requests to Dovenmuehle in which Plaintiff requested information about her mortgage account and requested that Dovenmuehle correct specific servicing errors. Dovenmuehle failed to

respond adequately to Plaintiff's first Qualified Written Request, and—aside from a bare letter of acknowledgement—failed to respond to Plaintiff's second Qualified Written Request at all. Not only has Dovenmuehle failed to refund Plaintiff for late fees that she paid due to Dovenmuehle's own negligence, but Dovenmuehle has recently lost a second payment from Plaintiff and is once again wrongfully asserting that Plaintiff is an entire payment behind. Based on Plaintiff's experiences so far this year attempting to correct Dovenmuehle's servicing errors, Plaintiff has no reason to believe that sending Dovenmuehle yet another Qualified Written Request would rectify this new problem.

### JURISDICTION AND VENUE

10.     The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2).

### PARTIES

12.     Plaintiff, Martha M. Kelley ("Ms. Kelley") is a natural person and "consumer" as defined by § 1681a(c).

13.     Defendant Dovenmuehle Mortgage, Inc. ("Dovenmuehle"), is headquartered in Illinois and does business in the Commonwealth of Virginia through its registered agent.

14.     Dovenmuehle is a "furnisher' of information as defined and governed by 15 U.S.C. § 1681s-2 and a "mortgage servicer" as defined by RESPA.

15.      Defendant Experian Information Solutions, Inc. ("Experian") is headquartered in California and does business in the Commonwealth of Virginia  through its registered agent.

16.      Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

17.      Defendant Trans Union LLC ("Trans Union") is headquartered in Illinois and does

business in the Commonwealth Virginia through its registered agent.

18.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

19.     Defendant Equifax Information Services, LLC ("Equifax") is headquartered in Georgia and does business in the Commonwealth of Virginia through its registered agent.

20.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f),and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

### *Dovenmuehle Failed to Notify Plaintiff about a Change in Escrow & Lost Plaintiff's February 2023 Mortgage Payment*

21.     Plaintiff is the owner of a real property located in North Chesterfield, Virginia. That property has a mortgage serviced by Dovenmuehle.

22.     Dovenmuele began servicing Plaintiff's mortgage on November 10, 2021, under a subservicing agreement with Department of Commerce Federal Credit Union. In the notice of servicing transfer dated November 10, 2021, Department of Commerce Federal Credit Union advised Plaintiff, "Please note that Dovenmuehle Mortgage, Inc. will act as a private label sub-servicer and service your loan in the name of Department of Commerce Federal Credit Union. All correspondence will have the DOCFCU logo, all telephone calls will be answered as DOCFCU, and all reporting to the credit bureaus will be done under the Department of Commerce Federal Credit Union name."

23.     During all relevant periods of time, Plaintiff made her mortgage payments to Dovenmuehle on time, within 30 days of her mortgage due date, including for the months of February 2023 through April 2023.

24.     In February of 2023, Dovenmuehle increased Plaintiff's monthly mortgage payment by $22.57 due to a change in escrow. Plaintiff's monthly mortgage payment went from being $1,393.63 per month to $1,416.20 per month.

25.     Dovenmuehle did not notify Plaintiff of the increase in her monthly payment prior to the payment increase.

26.     Because she was not informed of the payment increase, on or about February 1, 2023, Plaintiff made a monthly mortgage payment of $1,393.63 to Dovenmuehle.

27.     On February 28, 2023, Dovenmuehle called Plaintiff and informed Plaintiff that Dovenmuehle was charging her a late fee.

28.     Plaintiff first learned of the increased mortgage payment through this February 28, 2023 phone call.

29.     Because Plaintiff's mortgage payment due in March of 2023 was already scheduled to be sent via her bank's bill pay service in the amount of $1,393.63, on March 1, 2023 Plaintiff made an additional payment to Dovenmuehle, via telephone, in the amount of $104.71.

30.     The $104.71 payment that Plaintiff made on March 1, 2023 covered: the additional $22.57 due for both February and March, the $48.07 late fee that Dovenmuehle added for the February payment, and DOCFCU's $11.50 fee to pay via telephone.

31.     Plaintiff paid all amounts that Dovenmuehle asserted that Plaintiff owed — including the late fee that was incurred due to Dovenmuehle failing to notify Plaintiff of the February 1, 2023 escrow increase—within two days of Plaintiff being notified.

32.     However, despite Plaintiff doing everything in her power to rectify the situation that Dovenmuehle caused, Dovenmuehle began misapplying Plaintiff's payments.

33.     Specifically, Dovenmuehle lost the check that Plaintiff sent for her February 1, 2023 mortgage payment, applied the check that Plaintiff sent for March 1, 2023 to the amount owed for February, and began treating Plaintiff as though she were one month behind.

### *Plaintiff Sends Qualified Written Requests to Dovenmuehle and Requests that Dovenmuehle Correct her Mortgage Account*

34.     Dovenmuehle's loss of Plaintiff's February 2023 mortgage payment and misapplication of Plaintiff's March 2023 mortgage payment snowballed into additional servicing errors, including Dovenmuehle's treatment of Plaintiff's loan as 30 or more days past due and Dovemuehle's inaccurate reporting on Plaintiff's credit. Dovenmuehle also wrongfully assessed late fees against Plaintiff, sent Plaintiff harassing correspondence indicating Plaintiff's loan was in default, and repeatedly called Plaintiff to attempt to collect amounts that she did not owe.

35.     Plaintiff called Dovenmuehle multiple times and explained that Dovenmuehle had lost Plaintiff's February 1, 2023 payment. Plaintiff sent multiple copies of her February 2023 payment to Dovenmuehle, including proof that on February 9, 2023 the payment had cleared.

36.     Each time that Plaintiff called Dovenmuehle about the lost payment, Dovenmuehle assured Plaintiff that they would fix the problem.

37.     Plaintiff also emailed Dovenmuehle on February 28, March 10, April 9, April 11, and April 20 of 2023 regarding Dovenmuehle's servicing errors.

38.     In a reply email sent by Dovenmuehle to Plaintiff dated April 11, 2023, Dovenmuehle admitted that it had applied Plaintiff's March 2023 payment towards the amount due for February of 2023. In the email, Dovenmuehle makes no mention of the February 1, 2023 payment Plaintiff had made (which cleared on February 9, 2023).

39.    On May 4, 2023, Plaintiff sent a Qualified Written Request ("QWR") to Dovenmuehle (the "1st QWR") requesting specific information about her mortgage to which she is entitled (including a payment history and account history), and asking that Dovenmuehle correct its records and refund her for any late fees it had assessed against her. Enclosed with her 1st QWR, Plaintiff included a copy of the cleared February 1, 2023 check (front and back), a copy of the email sent to her from Dovenmuehle on April 18, 2023, and copies of Plaintiff's bank statements reflecting the following withdrawals:

| Date | Description | Amount |
|---|---|---|
| 12/01/2022 | Department of Commerce Federal C Bill Payment | -1393.63 |
| 12/30/2022 | Department of Commerce Federal C Bill Payment | -1393.63 |
| 02/01/23 | Department of Commerce Federal C Bill Payment | -1393.63 |
| 03/01/23 | Department of Commerce Federal C Bill Payment | -1393.63 |
| 03/01/23 | Dovenmuehl   DES:Dovenmuehl   ID:1463902427   INDN:Martha M Kelley CO ID:1221103001 TEL | -104.71 |
| 03/31/23 | Department of Commerce Federal C Bill Payment | -1,500.00 |

40.    Although Plaintiff had not yet received her bank statement reflecting her May 1, 2023 payment, Plaintiff also included payment details from her bank as proof that she paid $1,500 to Dovenmuehle on May 1, 2023.

41.    Dovenmuehle received Plaintiff's 1st QWR via Certified Mail on May 8, 2023.

42.    On or around June 14, 2023, Dovenmuehle mailed a letter to Plaintiff in response to her 1st QWR.

43.     Dovenmuehle's response to Plaintiff's 1st QWR was wholly insufficient. Dovenmuehle failed to provide Plaintiff with almost all the information that she requested and Dovenmuehle failed to correct the errors on Plaintiff's account.

44.     The only information that Dovenmuehle included was an Annual Escrow Account Disclosure which Dovenmuehle said that it mailed in December of 2022. The copy of the Annual Escrow Account Disclosure that Plaintiff received with Dovenmuehle's response to Plaintiff's 1st QWR was the first copy of the account disclosure that Plaintiff had ever received.

45.     In Dovenmuehle's response to Plaintiff's 1st QWR, Dovenmuehle categorized Plaintiff's proof of payment as "not sufficient enough" and requested that Plaintiff "resubmit a copy of front and back of the processed check for the February 1, 2023 payment"—something which Plaintiff had already provided to Dovenmuehle several times previously.

46.     On July 14, 2023, Plaintiff mailed another QWR to Dovenmuehle ("2nd QWR"). Plaintiff once again requested information about her account (including a payment and account history), requested that Dovenmuehle correct its servicing errors, and requested that Dovenmuehle refund Plaintiff for the late fees that it wrongfully charged her.

47.     Dovenmuehle received Plaintiff's 2nd QWR on July 21, 2023.

48.     On or around July 18, 2023, Dovenmuehle mailed a "DELINQUENT NOTICE" to Plaintiff, in which Dovenmuehle wrongfully asserted that Plaintiff was behind on payments and advised Plaintiff that Dovenmuehle has assessed late charges against her.

49.     On or around July 21, 2023, Dovenmuehle mailed a letter acknowledging receipt of Plaintiff's 2nd QWR.

50.     Plaintiff never received a response to her 2nd QWR from Dovenmuehle.

51.     Dovenmuehle still has not reimbursed Plaintiff for the late charges it wrongfully assessed against her or corrected its accounting to reflect that Plaintiff has made every payment in a timely manner.

52.     In Plaintiff's mortgage statement dated 10/16/2023, Dovenmuehle was still incorrectly asserting that Plaintiff was one payment behind, and that Plaintiff owed another late fee.

53.     On or around 10/17/2023, Dovenmuehle mailed a dunning letter to Plaintiff entitled "DELINQUENT NOTICE." In the dunning letter, Dovenmuehle states that it has not received the payment that came due on 10/01/23 and that it has assessed a late charge against Plaintiff.

54.     Plaintiff paid the mortgage payment that came due on 10/01/23 in full and in a timely manner through her bank's Bill Pay service.

55.     Dovenmuehle has failed to correct its servicing errors. Further, Dovenmuehle continues to harass Plaintiff and has repeatedly attempted to coerce Plaintiff into paying more than what she owes.

### Plaintiff Discovers the CRA Defendants Were Inaccurately Reporting the Dovenmuehle Account as Past Due and Disputes the Inaccuracies with the CRAs

56.     On April 25, 2023, Plaintiff obtained copies of her credit reports from Equifax, Experian, and Trans Union, and discovered that all three CRAs were inaccurately reporting her as behind on payments for her Dovenmuehle mortgage.

57.     On May 4, 2023, Plaintiff mailed dispute letters via Certified Mail to Equifax, Experian, and Trans Union regarding the Dovenmuehle mortgage account, specifically disputing the delinquent reporting of the account. With each dispute letter, Plaintiff included a copy of her driver's license, a 2022 W-2 proving her social security number, a copy of the 1st QWR, and proof that Plaintiff had made every payment that had come due that year.

58.     On May 16, 2023, Plaintiff's first dispute letter to Equifax was delivered. Plaintiff never received a response to this first dispute letter from Equifax.

59.     On May 8, 2023, Plaintiff's first dispute letter to Trans Union was delivered. Plaintiff never received a response to this first dispute letter from Trans Union.

60.     On May 8, 2023, Plaintiff's first dispute letter to Experian was delivered. On or around May 14, 2023, Experian mailed a letter to Plaintiff in which it refused to conduct an investigation into her dispute due what Experian characterized as "the limited amount of information regarding [Plaintiff's] dispute."

61.     On or about June 23, 2023, Plaintiff obtained copies of her credit reports with Equifax, Experian, and Trans Union. All three CRAs were still inaccurately reporting that Plaintiff was 30 days late on her Dovenmuehle mortgage in April of 2023.

62.     On July 14, 2023, Plaintiff mailed another set of dispute letters via Certified Mail to Equifax, Experian, and Trans Union regarding the Dovenmuehle mortgage account. She once again disputed the delinquent reporting of the account. With each dispute letter, Plaintiff included a copy of her driver's license, a 2022 W-2 proving her social security number, a copy of the 2nd QWR, and proof that Plaintiff had made every payment that had come due that year.

63.     On or around June 28, 2023, Equifax mailed a letter to Plaintiff which told Plaintiff that Equifax had verified the information it was reporting with Dovenmuehle. The letter showed that Equifax was still inaccurately reporting that Plaintiff had been late making her mortgage payments in April of 2023.

64.     On or around July 28, 2023, Experian mailed a letter to Plaintiff which told Plaintiff that Experian updated the information it was reporting from Dovenmuehle. The letter revealed that

Experian was still inaccurately reporting that Plaintiff was behind on her mortgage payments to Dovenmuehle in April of 2023.

65.     On or around July 29, 2023, Trans Union mailed a letter to Plaintiff which told Plaintiff that Trans Union had updated the information it was reporting from Dovenmuehle. The letter revealed that Trans Union was still inaccurately reporting that Plaintiff was behind in her mortgage payments in Dovenmuehle in April of 2023.

66.     Defendants had actual knowledge of these inaccuracies and deliberately chose to ignore and permit the inaccurate reporting of the account.

67.     Upon information and belief, Plaintiff alleges that on one or more occasions Experian, Trans Union, and Equifax forwarded Plaintiff's disputes to Dovenmuehle. Upon information and belief, Dovenmuehle was provided notice of Plaintiff's disputes, and, despite this notice, failed and refused to investigate and correct its inaccurate reporting.

68.     Experian, Trans Union, and Equifax each received the Plaintiff's disputes, but in each case wholly and entirely failed to conduct the reinvestigations required by law.  Instead, Experian, Trans Union, and Equifax merely "parroted" the information dictated to it by Dovenmuehle.

69.     Upon information and belief, Experian**,** Trans Union, and Equifax prepared and published to third parties multiple inaccurate consumer reports about Plaintiff that reflected the inaccurate derogatory Dovenmuehle account.

***Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers***

70.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress

adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

71.    "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

72.    Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

73.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin*

*v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

74.     It has long been the law that a CRA, such as Experian, Trans Union, and Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

75.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

76.     As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

77.     Further, as the CRA Defendants are aware, this Court has held that even though

the term "investigation" is not used in § 1681e(b), it is clear that the CRA Defendants have a duty

to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that

this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)].
> For example, Section 1681e(b) requires (1) "reasonable procedures" that (2)
> "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or
> certain: put beyond all doubt." *Webster's Third New International Dictionary* 133
> (1993). "Maximum" means the "greatest in quantity or highest degree attainable"
> and "possible" means something "falling within the bounds of what may be done,
> occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how
> "maximum possible accuracy" could be guaranteed without an adequate
> investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation,"
> necessarily implying that an "investigation" was required to have been performed
> in the first instance.

*Burke*, 2011 WL 1085874, at *4.

    78.    It has long been the law – since 1970, in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that
> may indicate systematic problems (by virtue of information from consumers, report
> users, from periodic review of its reporting system, or otherwise), it must review
> its procedures for assuring accuracy and take any necessary steps to avoid future
> problems. Similarly, it should establish procedures to avoid reporting information
> from its furnishers that appears implausible or inconsistent.

Fed. T. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011),

at 67.[1]

    79.    Today, furnishers such as Dovenmuehle have their own independent duties under

the FCRA—principally those found at 15 U.S.C. §1681s-2—which Congress first imposed almost

30 years ago.  THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No.

104-208 (1996).

---

[1] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–
fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

### *The CRA Defendants Did Not and Do Not*
### *Conduct Any Investigation of Most Consumer Disputes*

80.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of the CRA Defendants to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Both Equifax and Trans Union use the same vendor, previously known as Intelenet Global Services and now as Teleperformance. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mailed disputes.

81.     These dispute processing vendors are not hired to perform an actual FCRA investigation.  Instead, the vendors' sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

82.     In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer must click one of just a few available dispute reasons (such as "Not my account.").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union, or Experian. It gets sent to the CRA Defendants' creditor customer (such as  Dovenmuehle) for its sole review and consideration.

83.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.  That mailbox company receives consumer disputes and scans them into a batch of other disputes.

84.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

85.      Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters it receives, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

86.      Teleperformance and Experian Chile agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

87.      Equifax and Trans Union have both taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court recently, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

88.      Trans Union has taken and succeeded with this same position. *See, e,g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).[2]

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice.

89. Regardless of whether these statements are correct, Equifax, Trans Union, and Experian believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

90. Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to Dovenmuehle, Who Did Nothing

91. In at least one instance in which Plaintiff disputed the Dovenmuehle account with the CRAs, the CRAs forwarded Plaintiff's disputes to Dovenmuehle using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

92. e-Oscar is also the system by which Dovenmuehle has agreed it will accept such consumer disputes from the CRAs.

93. Under such circumstances, Dovenmuehle became obligated under the FCRA to investigate Plaintiff's disputes.

94. Plaintiff's disputes to Dovenmuehle to attempt to have it reinvestigate her complaints went unanswered, as it continued to report the inaccurate and derogatory history regarding the Plaintiff.

---

*Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in this District with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.).

To the extent Experian would reverse course from *Sublett* and argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax and Trans Union for their farming-out of investigations to Teleperformance.

95.     Dovenmuehle failed to reinvestigate Plaintiff's complaints.

96.     The information furnished by Dovenmuehle to Equifax, Experian, and Trans Union was at all times inaccurate.

97.     Plaintiff sent disputes to Equifax, Experian, and Trans Union in May of 2023 and again in July of 2023, each time requesting that the CRAs correct the inaccurate and derogatory representations made by Dovenmuehle on her credit file.

98.     On or about dates better known to Equifax, Experian, and Trans Union and Dovenmuehle, Equifax, Experian, and Trans Union furnished Plaintiff's disputes to Dovenmuehle.

99.     Equifax, Experian, and Trans Union all responded to Plaintiff's disputes in or around July of 2023, and each CRA claimed that the information disputed by Plaintiff was updated. These responses confirm that Equifax, Experian, and Trans Union communicated Plaintiff's disputes to Dovenmuehle.

100.     Dovenmuehle failed to reasonably reinvestigate Plaintiff's disputes that Dovenmuehle received from Equifax, Experian, and Trans Union, in violation of § 1681s-2(b)(1)(A) of the FCRA.

101.     Dovenmuehle further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Equifax, Experian, and Trans Union prior to the commencement of this action.

102.     By its actions as described in this Complaint, Dovenmuehle furnished and communicated false credit information in an attempt to oppress and harass Plaintiff into paying more money than what Plaintiff actually owed.

### *Plaintiff Suffered Actual Harm*

103.     Defendants have continued to report the derogatory Dovenmuehle account on Plaintiff's credit report, despite being notified multiple times that this information was inaccurate.

104.   Plaintiff has spent the greater part of this year attempting to resolve these matters with Defendants and her otherwise spotless credit history was significantly marred by Defendants' refusal to correct the inaccurate reporting.

105.   Prior to the inaccurate reporting described in this Complaint, Plaintiff had zero derogatory marks on her credit.

106.   As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

a.   **Money** lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

b.   Lost credit opportunities;

c.   Loss of time attempting to cure the error; and

d.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life; including

e.   Loss of concentration, anxiety, insomnia, feelings of fear, humiliation and embarrassment, loss of privacy, stomach pain, crying spells, irritability, harm to her reputation, and harm to her job performance.

### *Defendants' Conduct Was Willful*

107.   The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

108.   Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction

right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

109.    As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

110.    The CRA Defendants have received many disputes and other complaints regarding the creditors at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

111.    Just in federal court alone, during the last decade the creditor-furnisher disputed by Plaintiff has had to defend dozens of consumer lawsuits.

112.    In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

113.    The CRA Defendants knew or should have known of this litigation history.  They use and have access to PACER to investigate and monitor such consumer complaints.

114.    The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

115.    Each Defendant regularly receives unredacted consumer dispute details from this database.

116.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

117.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

118.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

119.    Further, over 140,000 of the CFPB complaints against Equifax, more than 110,000 complaints as to Experian, and over 120,000 complaints against Trans Union were based largely on their failure to reasonably investigate consumer disputes.

120.    Dovenmuehle has over 70 combined complaints against it in the CFPB database regarding inaccurate reporting of account information and Dovenmuehle's failure to correct inaccurate information following an investigation.

121.    Just in the last 12 months alone, Experian, Equifax, and Trans Union have each been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

122.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous federal district and circuit courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

123.    Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g., Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'");

*Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073–74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

124. Equifax has even been warned by its home district court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau*, 608 F.Supp. 972, 976 (M.D. Fla. 1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

125.    Trans Union has long been on even clearer notice. The seminal circuit court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).  Trans Union's notice was so substantial that one district court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, No. CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

126.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

127.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

128.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

129.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

130.   The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

131.   Among many of the CRA Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

---

[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

132.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they are unwilling to invest the money necessary to do so.

133.    Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of § 1681e(b) of the FCRA – against Experian, Trans Union, and Equifax

134.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

135.    Defendants Experian, Trans Union, and Equifax willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

136.    As a result of this conduct, action and inaction of Experian, Trans Union, and Equifax, Plaintiff suffered damage by lost credit opportunities, money lost attempting to fix her

credit, lost time spent attempting to fix the errors, mental anguish and stress, loss of concentration, anxiety, insomnia, feelings of fear, humiliation and embarrassment, loss of privacy, stomach pain, crying spells, irritability, harm to her reputation, and harm to her job performance.

137.    Further, after the Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Experian, Trans Union, and Equifax ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

138.    Each consumer reporting agency Defendant furnished consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

139.    As a result of Experian, Trans Union, and Equifax's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative, statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

140.    Experian, Trans Union, and Equifax's conduct, action and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

141.    Plaintiff is entitled to recover costs and attorney's fees from Experian, Trans Union, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## Violation of § 1681i of the FCRA – against Experian, Trans Union, and Experian

142.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

143.   Experian, Trans Union, and Equifax willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in the Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

144.   Further, Experian, Trans Union, and Equifax violated Section 1681i by conducting *no investigation at all*. Section 1681i demands that when Plaintiff notified each CRA directly of his disputes, that party-the consumer reporting agency who received the disputes-must investigate those disputes. The statute does not contemplate someone other than Experian, Trans Union, and Equifax conducting the investigation.

145.   Yet, both Equifax and Trans Union used an unrelated, third party, Teleperformance, over which neither CRA has control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and Trans Union therefore violated 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

146.   Furthermore, Experian used an unrelated, third party, Experian Chile, over which Experian has no direct control, to conduct its investigations. Experian Chile is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Experian therefore violated 1681i on this basis because it sent Plaintiff's disputes away to acompany that was not its controlled agent rather than investigating them as required.

147.   As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative,

statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

148.    Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

149.    Plaintiff is entitled to recover costs and attorneys' fees from Experian, Trans Union, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
## Violation of § 1681s-2(b)(1)(A) and (B) of the FCRA – against Dovenmuehle

150.    Plaintiff realleges and incorporates the foregoing paragraphs above as if fully set out herein.

151.    Defendant Dovenmuehle violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiff's disputes after the disputes were furnished to Dovenmuehle by Experian, Trans Union and Equifax.

152.    On one or more occasions within the past two years, by example only and without limitation, Dovenmuehle violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided to it by Experian, Trans Union and Equifax.

153.    Based on the way Experian, Trans Union and Equifax responded to-or did not respond to-Plaintiff's disputes, representing that Dovenmuehle had verified the supposed accuracy of its reporting, Plaintiff alleges that Experian, Trans Union, and Equifax did in fact forward the Plaintiff's disputes via ACDVs to Dovenmuehle.

154.    Dovenmuehle understood the nature of Plaintiff's disputes when it received the ACDVs from Experian, Trans Union, and Equifax.

155.    Notwithstanding the above, Dovenmuehle follows a systematically unlawful

process when it receives an ACDV dispute. Basically, all Dovenmuehle does is review its own internal computer screens for the account and repeat back to the ACDV system the same information it already has reporting to Experian, Trans Union, and Equifax.

156. When Dovenmuehle receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether the information already in its computer system itself is inaccurate.

157. As a result of Dovenmuehle's violations of 15 U.S.C. § 1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages including but not limited lost credit opportunities, money lost attempting to fix her credit, lost time spent attempting to fix the errors, mental anguish and stress, loss of concentration, anxiety, insomnia, feelings of fear, humiliation and embarrassment, loss of privacy, stomach pain, crying spells, irritability, harm to her reputation, and harm to her job performance.

158. As a result of Dovenmuehle's violations of 15 U.S.C. § 1681s-2(b), the Plaintiff is entitled to recover actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative, statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

159. Dovenmuehle's conduct, action and inaction was willful and it is liable for actual or statutory, and punitive, damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative Dovenmuehle was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

160. Plaintiff is entitled to recover costs and attorneys' fees from Dovenmuehle in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
### Violation of § 1681s-2(b)(E) of the FCRA – against Dovenmuehle

161.    Plaintiff realleges and incorporates the foregoing paragraphs as it fully set out herein.

162.    Defendant Dovenmuehle violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Experian, Trans Union, and Equifax and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Dovenmuehle's failure to investigate as articulated herein, after Dovenmuehle received notice of Plaintiff's disputes from Experian, Trans Union, and Equifax.

163.    As a result of this conduct, action and inaction of Dovenmuehle, Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, money lost attempting to fix her credit, lost time spent attempting to fix the errors, mental anguish and stress, loss of concentration, anxiety, insomnia, feelings of fear, humiliation and embarrassment, loss of privacy, stomach pain, crying spells, irritability, harm to her reputation, and harm to her job performance.

164.    As a result of Dovenmuehle's violations of 15 U.S.C. § 1681s-2(b), Plaintiff is entitled to recover actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative, statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

165.    Dovenmuehle's conduct, action, and inaction was willful, making it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

166.    Plaintiff is entitled to recover costs and attorneys' fees from Dovenmuehle in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT V
### Violation of RESPA, 12 U.S.C. § 2605(e) & (k) – against Dovenmuehle

167.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set forth

herein.

168.    On two occasions within the past two years, Plaintiff made a qualified written request to Dovenmuehle insisting that it conduct an investigation to correct inaccurate account information, refund the late charges wrongfully assessed against Plaintiff, and provide Plaintiff with information regarding her loan.

169.    Dovenmuehle received Plaintiff's 1st QWR and Plaintiff's 2nd QWR via USPS Certified Mail.

170.    Dovenmuehle failed to fully and adequately respond to Plaintiff's 1st QWR.

171.    Aside from a letter acknowledging receipt, Dovenmuehle failed to respond at all to Plaintiff's 2nd QWR.

172.    Upon information and belief, Dovenmuehle continued to report derogatory information to the CRAs during the 60-day periods following its receipt Plaintiff's qualified written requests.

173.    Dovenmuehle violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), by:

      a.  Failing to timely conduct an appropriate investigation of Plaintiff's inquiries;

      b.  Failing to conduct any investigation whatsoever regarding Plaintiff's inquiries;

      c.  Failing to timely provide Plaintiff with a true and accurate written explanation or clarification of the Plaintiff's legitimate questions regarding Plaintiff's loan;

      d.  Continuing to report information regarding allegedly overdue payments to the national credit bureaus, including during the 60-day period following its receipt of Plaintiff's qualified written requests.

174.    Dovenmuehle violated the Real Estate Settlement Procedures Act, 12 U.S.C. §

2605(k) by failing to take timely action to respond to Plaintiff's requests to correct errors relation to the allocation of payments on her mortgage account.

175.    As a result of Dovenmuehle's violations of 12 U.S.C. § 2605(e) & (k), Plaintiff suffered actual damages, including but not limited to: money lost attempting to fix her mortgage account, lost time spent attempting to fix the errors, mental anguish and stress, loss of concentration, anxiety, insomnia, feelings of fear, humiliation and embarrassment, loss of privacy, stomach pain, crying spells, irritability, harm to her reputation, and harm to her job performance.

176.    Dovenmuehle is liable for actual damages in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f).

177.    Dovenmuehle's conduct appears to be a pattern and practice of misconduct with many consumers. In addition to the pattern and practice that Dovenmuehle has demonstrated with Plaintiff's mortgage, there are 249 mortgage-servicing complaints listed against Dovenmuehle in the CFPB's consumer complaint database. Due to this pattern and practice, for each violation of 12 U.S.C. § 2605(e) and (k), Dovenmuehle is also liable to Plaintiff for additional damages up to $1,000 per violation.

178.    Plaintiff is also entitled to recover costs and attorneys' fees from Dovenmuehle in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f)(3).

## JURY DEMAND

179.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory, and punitive damages against Defendants; for her attorneys' fees and costs; for prejudgment and postjudgment interest

at the judgment rate; specific performance and injunctive relief; and such other relief the Court

deems just and proper.

November 3, 2023

 

 

Respectfully Submitted,

**MARTHA M. KELLEY**

By:/s/ Emily Connor Kennedy
Leonard A. Bennett, VSB #37523
Emily Connor Kennedy, VSB #83889
Mark C. Leffler, VSB #40712
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com
Email:  emily@clalegal.com
Email: mark@clalegal.com